1.5.1.4 UPL v. Tide International Morning, Your Honors, and may it please the Court. Maximilian Gianelli on behalf of UPL NA. In the decision on appeal, the Board made two errors. First, the Board erred in its construction of the claim term fillers. Second, in its obvious misanalysis- Ms. Gianelli, let me ask a few questions to sort of get the lay of the land here. Is this an expired patent? I believe it either has expired or will expire shortly. I think the date is 2022, I think. Right, it would expire. And is there other litigation going on at Gianelli? Yes, there is a district court litigation that's been stayed pending the resolution of the IPR. Right, but have other parties been sued? No, Your Honor. Right. Now, this is a strange patent. It's a consisting of patents, excluding other unstated components. And yet, every example has both a binder and a filler. And it looks like Claim 1 doesn't include any of the examples. That's a very strange patent. That's basically true, isn't it? It is, Your Honor. Claim 1 does have support. Claim 1 was an originally filed claim with the non-provisional application that issued as the 685 patent and also in the claims that were submitted with the preliminary amendment in the priority non-provisional application. Okay, but of course, infringement isn't at issue here. We're talking about validity. And doesn't Misselbrook disclose fillers and otherwise everything else that's in the claim, including asaphate? And so, why isn't that virtually a 102 reference? The issue with Misselbrook is that its fillers, the exemplary fillers, apart from one exception, are binding agents. And so, the issue is not whether or not you would include a filler. But they're stated to be fillers in Misselbrook. I'm sorry, Your Honor? They are stated in Misselbrook to be fillers. Yes, Your Honor, but it's undisputed in this case on appeal that when you put them in an asaphate granule, they function as binders. And the plain and ordinary meaning of the term fillers is a non-functional ingredient that's just added to make 100%. It's not an umbrella term to encompass all the other ingredients in the claim. Do you disagree with the Board's fact-finding that there's at least one non-binding filler disclosed in Misselbrook? That's the inorganic water-soluble salts? No, Your Honor. We do not dispute that. There's no evidence, at least in this record, that inorganic water-soluble salts are likely non-binding, non-functional. They would be fillers. So, you can have those as fillers. The key issue on appeal is whether or not a person of ordinary skill in the art had any scientific rationale to prepare an asaphate granule that did not include a binding agent. And neither the Board nor TIDE ever articulated any rationale to exclude, to not include, to not have a binding ingredient in an asaphate granule. The prior art taught, in fact, that such agents were required, and that's in Chan where Chan says that when you're preparing an asaphate granule, a minimum amount of a binding agent is required, and that's specific to asaphate. We also have Knowles that basically it's a textbook on agrochemicals, and it assumes that all granules must have a binding agent. Can I try to say what I think your argument is? Your argument is that asaphate is not described in one of the examples in Misselbrook. Now, you agree that Misselbrook has a non-binding filler, and it has the other elements in the claim, including not specifying a binder. But your view is nonetheless, because the reference teaches these things in disparate parts, there has to be some sort of motivation to have asaphate without a binder. Yes, Your Honor. You would need to pick and choose from a lot of different things. Misselbrook's disclosures are quite broad. You could have any water-soluble pesticide. You could even have a wettable powder. So there's a lot of picking and choosing to get at the granule that is in Claim 1, and Misselbrook doesn't precisely disclose the amount of a stabilizer, which may be why it was not asserted as a 102 reference. I'm sorry, Your Honor. No, I have no further questions on that. So if the only prior art reference that a person of ordinary skill in the art was aware of was Misselbrook, then maybe with those blinders on, one of ordinary skill in the art would think that it would be obvious to make the granule of Claim 1 to use these inorganic salts. But when read in the context of the prior art as a whole, there was very strong motivation to include a binding agent in an asaphate granule and no motivation to exclude one. I'd like to, if I may, address the Board's error on claim construction. So the Board erred when it determined that anything, including a binding agent, can be a filler in the context of a 685 patent. So binding agents assist in the binding of particles together in a formulation. The plain and ordinary meaning for fillers in the context of the 685 patent is exactly as one would expect, the nonfunctional ingredient to make 100%. Now this plain meaning is reflected in the 685 patent examples and in its identification of exemplary fillers. First, the patent examples consistently list fillers and binding agents as separate and distinct components of the granule. For example, in example 1, the granule includes 97% asaphate, 0.1% binding agent, and other functional ingredients, and 0.24% filler. So the amounts of the functional ingredients can be optimized for the properties of the granule. The filler, by contrast, is simply there to make the final concentration of asaphate exactly 97%. Now the patent teaches adding these fillers to make 100%, not adjusting the amount of a binding agent to make 100%. If we agreed with your plain construction, you still have to show that the Board erred in its definition, right? And that is specifically, as I see it, the Board didn't rely on obviousness with respect to the non-binding filler. And instead it says, Misslebrook teaches a non-binding filler, so I don't need to rely on obviousness for that. It did, in our view, that was error by the Board. The Board seemed to be looking for mere disclosure rather than a rationale for combining all of these things to arrive at the granule of claim 1. Is it, where do you draw the line between obviousness and anticipation? For example, we've got Kenna Metal in different cases that say, if a person of ordinary skill in the art can immediately envisage, you know, the combination of the different elements, then that would be appropriate for anticipation. I realize this is obvious because of the stabilizer. But setting that aside, you know, we're looking at whether a reference teaches, you know, scope and content of the prior art and the gram factors. Why couldn't the Board just rely on the scope and content of this prior art reference? Thank you, Your Honor. The issue that what Misslebrook teaches is that you can include these as fillers. And we actually didn't dispute that it would have been obvious to put fillers in a granule. The key issue that we disputed was whether or not it was obvious to prepare an acetate granule without a binding agent. So even if you have those inorganic salt fillers, you still need a rationale to not also have a binding agent. Misslebrook doesn't provide any reason for disregarding the teaching of Chan that in an acetate granule a minimum amount of a binding agent is required, or any reason to disregard Knowles that taught that it was just generally expected that granules contained binding agents and you just needed to figure out how much to include, not whether to include one at all. I don't recall, but I assume you did have expert testimony on this, and there was contrary expert testimony on this point? Your Honor, I believe that it was undisputed and all experts agreed that there was a motivation to add a binding agent to an acetate granule. So that part was undisputed. Expert testimony on both sides said that a person of ordinary skill in the art would want to add sugars to an acetate granule specifically because they hold the particle together. Now why is that? It's because Tide actually asserted the same prior art against Claim 1, no binding agent, and Claim 7 that required a binding agent. So Tide's expert and UPL&A's expert, everybody agrees. Yeah, you would have included a binding agent. There was a strong motivation to do so, and nobody ever articulated a rationale to not do so. Not the Board, not Tide. So putting Misselbrook in context, it's in all of the disclosures in Misselbrook where a granule is being prepared, binding agents are used. Those are lactose, sucrose, and glucose, and it's undisputed that those ingredients are binding agents. Which are stated to be fillers. They're stated to be fillers because Misselbrook provides a specialized definition of fillers. Misselbrook does not apply the plain and ordinary meaning of fillers. Misselbrook, in fact, defines fillers at the top of Column 6. Misselbrook's disclosures are focused on the solubility of the ingredients, so they provide a definition, an expressed lexicographical definition, where water-soluble fillers means basically any agent that's soluble or dispersible. And that's at the top of Column 6 in Misselbrook. So that is not the plain and ordinary meaning of fillers. In addition to the 685 patent, Mayer reflects the plain and ordinary meaning of fillers. Where Mayer identifies conventionally used fillers, and it's a long list, very similar to the ingredients in the 685 patent, of non-functional ingredients like clay and kaolin. And that is the plain and ordinary meaning of fillers. Of course, what a reference teaches is a question of fact. And the Board decides that, and we owe deference to that. So you've got a hill to climb. Yes, Your Honor. The question of facts that I think, and I think here the Board erred, because it really was looking at whether the Board, on page 30, the Board's error is essentially that it would have been obvious not to use both non-binding and binding fillers. So they're really trying to address the question of, was it obvious to include fillers without ever getting to the ultimate question of, was there a reason to not include a binding agent? Was there a reason to disregard the teachings of the prior art that binding agents for acetate brandles were required and very important for non-dustiness and worker safety? No unexpected results were asserted. Is that right? That's correct, Your Honor. We did explain that the world of pesticide formulation is somewhat unpredictable, which had particularly proven the case for acetate. Acetate, the molecule, was registered back in the 70s, and people had very difficult times developing granules with high concentrations of acetate. But we did not argue unexpected results. Your Honor, I'd just like to make one last point, that if you're adding a binding agent in an amount to make 100 percent, you're adding a binding agent to make 100 percent. It doesn't somehow convert the binding agent into a filler. Those molecules, the sugars, they still have binding properties. But it serves the purpose of a filler if it makes up to 100 percent. But it doesn't fit the plain and ordinary meaning of the term fillers. Thank you. I'll reserve the rest of my time for a moment. Thank you, Counselor. Ms. Benedict. Good morning, Your Honors. May it please the Court. I'm Bailey Benedict on behalf of Appellee Tide International. Before I start, Your Honors asked my colleague a couple of questions that I wanted to provide Tide's perspective on. The first one, fairly simple, was the expiration date of the patent. Yes, the patent has expired at this point in time. The second question that was asked was, why isn't Mistelbrook a 102 reference? The answer to that is that Mistelbrook did not disclose the specific concentration ranges, for example, for the limitation of a stabilizer. And so CN-588 was combined because it disclosed specific ranges and examples of stabilizers that would work to bolster that. JP-902 was specifically added to bolster Mistelbrook's disclosure of high-concentration acephate granules. JP-902 contains several working examples of high-concentration acephate granules. But those are not the issue on appeal today. The issue of whether there is a stabilizer, the issue of whether a person of ordinary skill in the art could make a high-concentration acephate granule, that's not on appeal today. So for the purposes of this appeal, it almost is like Mistelbrook acts as a 102 reference. There were a few other points I wanted to address. The first was that the motivation to add a binding agent was undisputed. And that is, to a certain extent, correct. What's the plain and ordinary meaning of fillers? The plain and ordinary meaning of fillers is any substance that is added to a formulation to make 100%. And the board laid this construction out, I believe, at page 29. It's just an ingredient added to make 100%. There is no requirement that it be non-functional. The requirement is that it is an ingredient that a person of ordinary skill in the art would understand is added to a formulation to reach 100%. That can include some known binding agents. Those binding agents are often also added just to make up the difference. And my colleague's statement of what the function, the purpose of a filler is, just to make 100% so you can keep the acephate percentage at the same level, was correct. The distinction they're trying to draw that's incorrect is that fillers must be non-functional. And in fact, in drawing that distinction, counsel pointed to the definition of fillers in Misselbrook, and that is at Misselbrook, column 6, lines 1 through 13. And she said that Misselbrook has special lexicography to explain that a filler really is focused on the water-soluble nature of the filler. But that's actually not true. The term that Misselbrook is describing there is the term water-soluble filler. And in the definition, Misselbrook discloses examples of things that are water-soluble. But Misselbrook was not using special lexicography to say that all fillers must be water-soluble, merely that the fillers that Misselbrook was concerned with were water-soluble. Now, Misselbrook, it is worth mentioning, Misselbrook at no point mentions the binding properties of these preferred fillers, lactose, et cetera, the fillers that are also binding agents. Misselbrook does discuss, fairly briefly, but it does discuss the importance of making granules that are not dusty. But Misselbrook never says, and we like the use of lactose as a filler because lactose is a binding agent. Instead, what Misselbrook discusses is the advantages of lactose because it is easy to handle, because it is dissolvable in water to form a clear solution, because it is biologically derived, and so it has less environmental impact. Do I understand that some of those characteristics you just described would also apply to the inorganic water-soluble salts as well? That is correct, yes. Inorganic water-soluble salts typically would dissolve to form a clear solution. They would be easy to measure by volume. I can't speak to the environmental impact of them. I don't believe we have anything in the record on that one way or the other. But yes, that is correct, that inorganic water-soluble salts would also meet those qualities of fillers that Misselbrook discussed as important. It is not the binding properties of the fillers that Misselbrook ever discusses as important, and that undercuts UPL's argument that the binding nature of the preferred fillers is a key element of Misselbrook's disclosure. How do you respond to the argument that, you know, I think the argument is that given the evidence in the argument presented to show the obviousness of Claim 7, specifically in showing that it would have been obvious to add a binding agent to asaphate, that then for this rejection or this proposed ground that applies to a different claim that is not, in your view, not supposed to have a binding agent, how do you respond to that, that the board had to then present, or the petitioner had to present evidence of obviousness to not have a binding agent? I tied with disagree that you need evidence to exclude a binding agent, and looking at the prior art and looking at the 685 patent, for example, shows that you don't actually need specific evidence to exclude a binding agent. There is testimony, there is nothing conflicting about the position that in some circumstances you would be motivated to include a binding agent, and in some circumstances you would not be motivated to include a binding agent. And there is testimony... What is that explanation? Yes, there is testimony from Mr. Geigel that the board relied on in its decision that a person of ordinary skill would be motivated to optimize the granules and would be motivated to include ingredients in order to optimize them and at the concentrations needed. And so if a granule that you made did not have adequate binding properties, then you would be motivated to add a binding agent to that granule. It's part of the process of pesticide formulation. And Mr. Geigel also testified that that process, that formulating granules, was known in the art, and that, again, was relied on by the board in its opinion. And so it is not necessary... The two situations are not mutually exclusive. You can be motivated both to make a formulation without a binder, and you can be motivated to include one if one is needed. It is part of the process a person of ordinary skill would undergo in formulating a granule. Dr. Rockstraw also testified to that effect, that he would agree that a person of ordinary skill in the art would not be motivated to include a binding agent if the granule had good enough binding properties without a binding agent. I don't. I find the definition of board filler to be difficult, and I don't... I struggle a little bit because both of you, the patent owner and petitioner, said it should be given its plain and ordinary meaning, but then, of course, there's a dispute, apparently, over what that plain and ordinary meaning was. And neither of you introduced, it seems, expert testimony, for example, that explains whether it does, in its plain and ordinary context, include a binding agent or not. Am I missing something there? With respect, Your Honor, you are. Ty did include expert testimony explaining that the plain and ordinary meaning of filler would include known binding agents, and that is in... But the board didn't rely on that, though. The board did rely on that, Your Honor. Is that Mr. Gigler? Mr. Geigel, yes, Your Honor. It's Mr. Geigel's opinion at... The board relied on it twice, actually, once on, I think, page 28 and once on page 29, and it's Geigel paragraph 95. Okay, so you introduced evidence that the plain and ordinary meaning of filler includes things that would be known to have binding properties. The board relied on that, and we have to give that substantial evidence of deference, correct? That is correct, Your Honor. I will... What do you do with the fact that the patent seems to distinguish between binding agents on the one hand and fillers on the other? I'm not suggesting it rises to the level of some sort of disclaimer of this plain and ordinary meaning, but it does seem to do so. In column 2, in particular, it lists the things that are included, and it has a binding agent, and then it has separately filler. Yes, Your Honor. There is a difference between a binding agent and a filler. A filler is something that a person of ordinary skill in the art would add to dilute the pesticide, to keep it at whatever concentration of acetate you wanted. And a binding agent is something that has binding properties for the granule. Now, some binding agents can be used as fillers. A person of ordinary skill in the art would use some binding agents as a filler. There is nothing at all in this that reads out the limitations. Do you have evidence? Just think about where's the intrinsic evidence for what you're saying? Where in the record are you relying, instead of just telling us your view? If you could cite record evidence, that would be a lot more persuasive. Yes, Your Honor. I apologize. I'm still on Appendix 765, which is Mr. Geigel's declaration at paragraph 95. How do you respond, though, to the point made by Judge Moore about the specification seemingly distinguishing binding agents from fillers? The response... Is it relying on expert testimony? It does. So Mr. Geigel's testimony on this point that some binding agents would be considered fillers is the evidence that is in the record about whether or not it is appropriate or whether or not fillers and binding agents are different. I will note that the 685 patent also discloses or also requires a stabilizer in Claim 1 and in Claim 7, just as they require a filler in Claim 1 and Claim 7. And the definition, the construction of a stabilizer, which was actually originally proposed by UPL in the district court, is any agent that promotes the chemical or physical stability of a granule. And so by UPL's own definition, all binding agents are stabilizers because all binding agents promote the stability of a granule. They promote the ability of a granule to stay together. But that is not... That's not a point at issue in this appeal, but it is further evidence in support of the fact that there is nothing contradictory about listing filler and binding agent and stabilizer and wetting agent all differently. There are ingredients... I understand your point. Your point is that even if there's some overlap in what's a binding agent and a filler, so long as you're not double counting to reach your 100%, you think that it's okay if there's some overlap. Do you understand what I'm saying? Yes, and you said it better than I did. Yes, Your Honor. That is what we are saying. And that is, in fact, also what the board said. Do you think that you advocated for a motivation to combine the water-soluble filler, the salt, the inorganic salt, I don't know if I'm saying it right, but it's disclosed in Missile Brook with the rest of the claim elements?  Or was your argument that a motivation to combine was unnecessary? So specific to the issue of combining the water-soluble salt, I believe the argument would be that the motivation to combine is not necessary. As I mentioned earlier, Missile Brook, standing alone by itself, discloses that, discloses all of the five claimed ingredients, discloses that an appropriate filler is an inorganic water-soluble salt. There is nothing that we need to be motivated to combine there. It is Missile Brook being combined with itself. Well, but wait a minute, and I'm not as familiar with this as you are, so please help me understand. Is the water-soluble salt discussed in a separate embodiment from the embodiment that really does contain all of the other elements but for the percentage of stabilizer? No, Your Honor, it is not discussed in a separate embodiment. The embodiment that discusses all of the elements, including stabilizer, simply says that, let's see, I'm looking at Appendix 815, Missile Brook at 261 through 65, and similarly at 653 through 57. Both places state that in addition to the pesticide, the water-soluble filler, the wetting surfactant. What column and line number are you on? Right now I'm at 653 through 57. I don't know what 653 is. I'm in Missile Brook, which is at Page 815 of the appendix. Yes, I apologize. It's Appendix Page 817, Column 6, Lines 53 through 57. In addition to the pesticide, the water-soluble filler, the wetting surfactant, dispersing surfactant, and defoaming agent, the instant pesticidal compositions may also appropriately contain stabilizer, synergist, coloring agents, et cetera. There is a similar disclosure at Page 815, which is Column 2, Lines 61 through 65, that lists the water-soluble pesticide, water-soluble filler, wetting surfactant, dispersing surfactant, and an optional defoaming agent. Okay, thank you, Ms. Benedict. We've exceeded your time. Ms. Gianelli, you have some rebuttal time. Thank you, Your Honor. I just have a couple of points to make. First, there is testimony in the record on the plain and ordinary meaning of fillers in the context of the 685 patent. That was from Dr. Rockstraw's deposition in the Joint Appendix at Page 1437, where he explains that a filler in the context of the 685 patent has, quote, has no function in the performance of your chemical system. If the material offers binding capabilities, it is a binder, not a filler. The problem is you're pointing to alternative evidence, but the Board on Pages 29 to 30 adopted a construction of filler, which is based upon Mr. Geibel's testimony that I have to give substantial evidence deference to. So you may have had a different expert that said the opposite, but the Board credited this expert over your expert. I don't know why. They don't tell me why. But I have to give substantial evidence deference to that. But the ultimate question on what a filler is in the context of the 685 patent, I believe, is still a matter of law. And the construction that was adopted by the Board and advanced by time is— What a filler is is a question of law? I'm sorry? What a filler is is a question of law? It's a matter of—the ultimate conclusion is a claim construction, Your Honor, correct? Mm-hmm. So if there are underlying facts that the ultimate question on the interpretation in the context of the 685 patent is a question of law and the construction adopted by the Board essentially erases the word fillers and just says anything to make 100%. And so that itself is basically taking that word out of the claim and it's untethered to the 685 patent specification. So to conclude, if you add a binding agent to make 100%, it is still a binding agent and it is still an ingredient excluded from Claim 1. Okay, I thank both counsel. This case is taken under submission.